{¶ 58} While I agree that the estate's expert would have beenqualified to testify on the ultimate issue of breach of the standard of care, I believe that he was incompetent to testify due to his own admission he did not devote at least fifty percent of his time to the clinical practice of medicine as required by Evid.R. 601(D).
 {¶ 59} The estate's lone expert witness was a full-time professor of epidemiology at the University of Minnesota. The university recruited him to begin a program that taught physicians the methodology and ethics of patient-based research. In addition to this program, the expert was active in cardiac prevention clinics in both Minnesota and Florida. During cross-examination, the expert conceded that he had a "low percentage" of practice related to primary care medicine. In response to a question whether the expert followed patients throughout the course of their illness, the expert replied that he was not currently following any patients. When asked about his routine, the expert gave this testimony:
 {¶ 60} "Q. Okay. So, you're not following them now?
 {¶ 61} "A. Correct.
 {¶ 62} "Q. You have some time in the past?
 {¶ 63} "A. Correct.
 {¶ 64} "Q. You see them now on a consultive basis; do you not?
 {¶ 65} "A. Correct.
 {¶ 66} "Q. You see them on an occasion and then another doctor may see them the next time they're in, correct?
 {¶ 67} "A. That is true.
 {¶ 68} "Q. The fact of the matter, you did not follow your patients on a regular basis, true?
 {¶ 69} "A. Currently, no."
 {¶ 70} Upon further questioning, the expert admitted that it "had been a number of years" since he admitted a patient into the hospital and that he had no current plans to do so. In 1990, the expert decided not to continue as the cardiology director in Florida in order to focus on research. That same year, he stopped teaching cardiology. In 1991, he became the director of the division of clinical pharmacology at the University of South Florida, and in 1992, he became board certified in clinical pharmacology. In 1998, he moved to Minnesota where he became a professor of epidemiology at the University of Minnesota. He maintained a consulting position with the clinical pharmacology division even after moving to Minnesota. His current teaching assignments in Minnesota were "fundamentals of clinical research and literature review seminar."
 {¶ 71} On the issue of the precise amount of time devoted to an active clinical practice, the expert said at a deposition taken in March 2000 that he estimated that classroom teaching took up sixty to eighty percent of his time, with the remainder given to clinical trials and administration. At the time of trial in August 2002, the expert said that division of duties had changed, with his teaching duties decreasing "linearly" with each passing month. A detailed look at his teaching schedule showed that the expert taught a clinical research seminar and clinical research literature review in Spring 2000; no classes in Summer 2000; fundamentals of research in Fall 2000; clinical research project seminar in Spring 2001, no classes in Summer 2001; fundamentals of clinical research in Fall 2001; clinical research seminar in Spring 2002; and direct study in Summer 2002 (a thesis class where he guided the students in individual projects).
 {¶ 72} The expert's current clinical research involved the study of new drugs which explored the relationship of estrogen replacement therapy and its effect on the development and prevention of osteoporosis and cardiovascular outcomes. Finally, the expert was forced to concede that the American Medical Association listed his "major professional activity" as "research."
 {¶ 73} With this information, Price asked the court to strike the expert's opinions under Evid.R. 601(D). Price argued that the expert could not establish that he spent at least one-half of his professional time in the active clinical practice of cardiology. The court denied the motion by saying that "the witness doesn't have to be the best witness."
 {¶ 74} I am unsure what the court meant when it said "the witness doesn't have to be the best witness." In the context of expert testimony, it is true that neither party is obligated to find the "best" expert in any given field of expertise. But that wasn't a question before the court — the question was whether the estate's expert devoted at least one-half of his professional time to the active clinical practice of cardiology. The court's reason for denying the motion was non sequitur and shows that the court did not have the proper legal standard in mind when it denied Price's motion.
 {¶ 75} Had the court applied the proper standard to the legal question before it, it would have no choice but to find that the testimony showed rather convincingly that the estate's expert did not spend at least one-half of his time in the active clinical practice of medicine when he testified at trial. The expert conceded that he did not actively see patients, that he had not admitted a patient to the hospital for several years, and that he does not perform in-patient care. At best, the expert could be said to be engaged in clinical trials of drugs which were unrelated to cardiac care as raised as an issue in this case. At the time of trial, the expert said that among his clinical trials he was studying estrogen replacement therapy. I can see no possible means of correlating the study of estrogen replacement therapy to the issues of diagnosis and treatment of heart disease as raised in this case. It may be that the expert's research involves the effects of certain drug therapies on individual patients, but the expert rather explicitly stated that he did not see any patients as part of his research. In short, the expert did not spend at least one-half of his time in the active clinical practice of medicine.
 {¶ 76} The estate argues that even if we find that the expert did not devote at least one-half of his professional time to active clinical practice, he nevertheless qualifies as an expert because his activities are necessarily related to or adjunctive to patient care. In the past, the expert had significant experience in cardiology. Regardless of the merits of the expert's past qualifications, it is important to understand that Evid.R. 601(D) is a rule of competency, not qualification. The world's foremost medical expert could be rendered incompetent to testify if that expert had retired from medical practice only days before because that expert would not be "actively" engaged in clinical practice at the time of trial testimony. The lifetime of experience gained in the field — the expert's qualifications — would mean nothing for purposes of the rule. Evid.R. 601(D) is a remedial rule and like other remedial rules or statutes, "should be liberally construed and applied to effect their respective purposes." See Wellston Iron Furnace Co. v.Rinehart (1923), 108 Ohio St. 117, syllabus. The purpose of Evid.R. 601(D) is to ensure that those testifying about applicable standards of care give their testimony based on experience within the field. The expert's research had no direct relationship with the cardiac issues raised by the estate. Consequently, the expert should have been declared incompetent and his testimony on matters of expert opinion should have been stricken. I would hold that the court abused its discretion by refusing to do so. And because the estate's expert witness was its only expert witness, the record as it stands before us would not establish any evidence going to the applicable standard of care; hence, the court should have found the witness incompetent and directed a verdict in Price's favor. Accordingly, I respectfully dissent.
It is ordered that appellee recover of appellants her costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.